## PACIFIC LIVE STOCK CO. v. RICKEY et al. (ESTES et al., Interveners).

### No. 731.

District Court, D. Nevada.
Aug. 27, 1934.

W. M. Kearney, of Reno, Nev., for Water Commissioners.

Green & Lunsford, of Reno, Nev., for Antelope Valley Mut. Water Co.

NORCROSS, District Judge.

Upon motion on behalf of the water commissioners appointed to regulate the waters of Walker river and its tributaries according to the decree entered in the above-entitled cause, a citation was issued to the Antelope Valley Mutual Water Company and its directors to show cause why they should not be adjudged in contempt for interfering with the regulation of the waters of said stream by said commissioners.

Upon the same day the above-mentioned motion was filed, June 4, 1934, upon petition of the Antelope Valley Mutual Water Company, successor in interest to defendant Antelope Valley Land & Cattle Company, substituted defendant for Thomas B. Rickey, alleging that said water commissioners had ignored the terms and conditions of said decree in measuring and distributing waters to said Antelope Valley Mutual Water Company to its irreparable injury and damage and praying for an order directing said water commissioners to administer said decree in accordance with its terms and provisions, a citation was ordered issued directed to said commissioners to show cause why the prayer of said petition should not be granted.

A joint hearing was had upon the return of both said citations. The principal question involved in both proceedings is presented in two of the paragraphs of an answer

filed by said commissioners to the petition of said Antelope Valley Mutual Water Company. The said paragraphs read:

"They deny the whole and every part of the allegations reading: 'That in and by the said judgment and decree, it was, among other things, adjudged and decreed that in order to determine whether the Antelope Valley Land & Cattle Company is taking more water than its due proportion, the West Fork (of the Walker River) shall be measured at the Government station at the upper end of Antelope·Valley, and all tributaries of said West Fork entering Antelope Valley below that point shall be measured, and said West Fork (of the Walker River) shall also be measured above the outlet of said reservoir a sufficient distance so that said measurement would in no way be affected by water from the outlet of said reservoir, and if the due proportion of the water of said river and its tributaries at the upper points belonging to the parties hereto below Antelope Valley is in the river at the lower point, then it shall be deemed that the Antelope Valley Land & Cattle Company is not taking more than its due proportion of said water,' and in this connection these defendants refer to said judgment and decree on file with the clerk of the above entitled court for a correct recital of the provisions of said decree. * * *

"They deny that after the entry of said decree and in the year 1926 the said reservoir as mentioned in said decree was constructed, but admit that a reservoir was constructed by Walker River Irrigation District, a public corporation, in the years 1921–1923 at what is known as 'Topaz Lake'; and in this connection they expressly deny that the so-called 'Alkali Lake Reservoir', referred to in said Decree No. 731, was ever or at all constructed by said Antelope Valley Land & Cattle Company, but on the contrary allege that Alkali Lake Reservoir (now known as Topaz Lake Reservoir) was constructed by Walker River Irrigation District, a corporation, and that the land upon which said reservoir exists, which belonged to said Antelope Valley Land & Cattle Company at the time of the entry of said Decree No. 731, was purchased from said Antelope Valley Land & Cattle Company by said Walker River Irrigation District, and allege that the said Antelope Valley Mutual Water Company, as successor to Antelope Valley Land & Cattle Company, has no right, title, interest, claim or demand whatsoever in or to the waters of said Alkali Lake Reservoir (now known as Topaz Lake Reservoir).''

The main fact which has brought into controversy the meaning of a portion of the decree finally entered by Hon. M. T. Dooling, District Judge presiding, on March 22, 1919, in a suit instituted June 10, 1902, by Miller & Lux, a corporation, against Thomas B. Rickey et al., involving rights of the respective parties to said suit to the waters of Walker river and its tributaries in the states of Nevada and California, is the shortage of water in the stream system due to drought conditions prevailing in this year, 1934. The said commissioners finally determined the water supply to be only sufficient to supply decreed rights to and including the year 1879. The decree determines the rights of the parties to the suit based upon appropriations beginning with the year 1860 and ending with the year 1905 or 1907.

The contention is made upon behalf of the Antelope Valley Mutual Water Company that, as successor to the interests of the Antelope Valley Land & Cattle Company, its rights are to be determined by subparagraph 5 of paragraph 8 of the decree. So much of said paragraph 8, including subparagraph 5, as may aid in a determination of the question presented, follows:

"8. Nothing herein contained shall be deemed to in any way change or affect the provisions of the said contract dated August 2nd, 1913, by and between the parties to this suit, but the rights herein adjudged are adjudged subject to the provisions of the said contract, and particularly to the following provisions thereof:

"1. * * *

"2. In case the said Antelope Valley Land & Cattle Company shall complete the Alkali Lake Reservoir, it may take a quantity of water from the West Fork of Walker River at low stages in excess of its due proportion in view of the priorities herein adjudged, but not exceeding the total amount adjudged to it by this decree, providing it turns out of the said reservoir at the same time and as a substitute therefor a like quantity of water out of its share of said waters for use by the other parties hereto, and which shall be used by them as a part of the river flow in accordance with their relative priorities as herein established.

"3. In case the said Alkali Lake Reservoir is built as provided in the said agreement, water may be stored in the same from the first of November to the first of March irrespective of any of the rights and priorities hereby adjudged and fixed, and may also be stored at any time when there is in the river a quantity

of water in excess of the total amounts adjudicated to the parties hereto, to the extent of such excess, but water shall not be stored in the said reservoir so as to deprive the parties hereto of stock water or water now in use for power purposes."

"4. All water so reservoired in excess of the amount turned out of said reservoir to make up for the excess water diverted from the river by the Antelope Valley Land & Cattle Company as aforesaid, shall belong to the stockholders in the corporation constructing said reservoir according to the amount of stock each shall hold in the company constructing the said reservoir, subject to the right of the parties hereto to receive from the said reservoir a quantity of water equal to the excess water so used by the Antelope Valley Land & Cattle Company as aforesaid."

"5. In case the said reservoir is built, then in order to determine whether the Antelope Valley Land & Cattle Company is taking more water than its due proportion, the West Fork shall be measured at the Government station at the upper end of Antelope Valley, and all tributaries of said West Fork entering Antelope Valley below that point shall be measured, and said West Fork shall also be measured above the outlet of said reservoir a sufficient distance so that said measurement would in no way be affected by water from the outlet of said reservoir, and if the due proportion of the water of said river and its tributaries at the upper points belonging to the parties hereto below Antelope Valley is in the river at the lower point, then it shall be deemed that the Antelope Valley Land & Cattle Company is not taking more than its due proportion of said water."

The said contract of August 2, 1913, which is set out in full in the preliminary recitals of the decree, in addition to provisions referred to in the foregoing subparagraphs 2, 3, 4, and 5, quoted supra, contains the following provisions:

"2. Rights of Antelope Valley Land & Cattle Company to be fixed as follows:

"(a) Land irrigated and dates of irrigation, both in California and Nevada, to be in accordance with testimony already taken and the law of appropriation.

"(b) Priority to be allowed from date of first irrigation although transfer from person first irrigating was by parol. * * *

"5. In case Antelope Valley Land & Cattle Company shall complete Alkali Lake Reservoir, it may take a quantity of water from the West Fork of Walker River at low stages

in excess of its due proportion, but not exceeding the amount adjudged to it, provided it turns out of the reservoir at the same time a like quantity of water for the use of the other parties, which shall be charged to the shares of stock held by said Antelope Valley Land & Cattle Co. in said reservoir."

"6. In case the reservoir is built, it shall be built by a company formed by Antelope Valley Land & Cattle Company for that purpose. Such corporation shall be controlled by Antelope Valley Land & Cattle Company until said reservoir is constructed to its natural capacity and said stock paid for, and thereafter the same shall be controlled by the stockholders holding said stock. Stock shall be issued for each acre foot of storage capacity of said reservoir. Such certificates of stock may be purchased and the holder thereof may use the water represented thereby on any land he desires, and such certificates may be sold and transferred with or without the land and the land upon which the water is to be used may be changed from time to time by the holder thereof. Actual construction on said reservoir shall be commenced within one year from the date of the consent of the Government of the United States to the construction of said reservoir and the subscription to or sale of the said stock as herein provided, and shall be completed within two years thereafter to its natural capacity, and if not so commenced and completed, the parties to this agreement, other than the Pacific Livestock Company and Antelope Valley Land & Cattle Company, owning a majority of the acreage irrigated by the parties hereto may organize a company for the purpose of constructing said reservoir under the terms and conditions set forth in this agreement. * * *

"8. All parties hereto shall use their influence in getting the consent of the Government to the use of said reservoir site. * * *

"11. All water in the reservoir in excess of the amount, turned out of said reservoir to make up for the excess water diverted from the river by the Antelope Valley Land & Cattle Company, shall belong to the stockholders according to the amount of stock each shall hold in said company constructing said reservoir, subject to the provisions of paragraph five (5) hereof. * * *

"13. The parties hereto shall in some suitable way guarantee the purchase of their due proportions of said reservoir certificates whenever said Antelope Valley Land & Cattle Company or other company heretofore mentioned is ready to proceed to construct said reservoir and payments on said certifi-

cates may be called for from time to time as the work progresses. Nothing herein shall be deemed an agreement by any party to purchase said shares, but only an option to purchase the same, nor shall it be deemed an agreement to build said reservoir, but only an option to do so in case the parties desire and are willing to subscribe to said stock, and a party may subscribe for less than his proportion of said stock if he desires."

The reservoir referred to in paragraphs 5, 6, 10, 11, 13, and 17 of the contract of August 2, 1913, set out in the preliminary recitals of the decree and referred to in paragraph 8 of the decree, was never constructed by the Antelope Valley Land & Cattle Company, or by any other company organized in pursuance of paragraph 6 of said contract. Some years later a reservoir was constructed upon the site of the said Alkali Lake Reservoir by the Walker River irrigation district, organized under the laws of the state of Nevada (In re Walker River Irr. Dist., 44 Nev. 321, 195 P. 327), and said reservoir was completed in the year 1923, and thereafter called Topaz Lake.

■ Notwithstanding the fact that a reservoir was never constructed in pursuance of the said contract of August 2, 1913, it is the contention of the Antelope Valley Mutual Water Company that subparagraph 5 of paragraph 8 of the decree is nevertheless controlling and should be so held. It is contended that, as the parties to the suit other than the Antelope Valley Land & Cattle Company were the principal parties affected by and interested in the creation of the irrigation district, the reservoir by it constructed should be considered as constructed by a company organized by parties to the stipulation and agreement of August 2, 1913, "owning a majority of the acreage irrigated by the parties hereto * * * under the terms and conditions set forth in this agreement," as referred to in paragraph 6 of said agreement.

The court is not impressed with the contention that the Antelope Valley Mutual Water Company, as successor in interest to the rights of the Antelope Valley Land & Cattle Company, is entitled to claim any rights under subparagraph 5 of paragraph 8 of the decree. That paragraph is to be construed in the light of other provisions of the agreement and decree. By paragraph 13 of the agreement it was expressly provided that "nothing herein shall be deemed an agreement by any party to purchase said shares, but only an option to purchase the same, nor shall it be deemed an agreement to build said reservoir,

but only an option to do so. * * *" If built under the provisions of paragraph 6 of the agreement, it would be a strictly private corporation with the stored water owned in accordance with the certificates held by those who exercised their option to become investors therein. Whether built by the Antelope Valley Land & Cattle Company or other parties to the agreement, the Antelope Valley Land & Cattle Company would necessarily have an interest in the stored water therein, for the reason that company already had an interest in the reservoir site and the cost thereof was to be inclusive of "the land and work already done thereon." It does not appear to be contended that the Antelope Valley Land & Cattle Company retained any right to the stored waters of the Topaz Lake Reservoir constructed by the Walker River irrigation district. The reservoir constructed by said district is neither in fact nor law the "said reservoir" referred to in subparagraph 5 of paragraph 8 of the decree.

■ Assuming, however, it is immaterial by what means the reservoir was built, and that subparagraph 5 is therefore to be applied, it is not susceptible to the construction contended for.

The construction of subparagraph 5 contended for would give to the Antelope Valley Land & Cattle Company and its successors in interest at times when the natural flow of the Walker river and its tributaries is insufficient to supply full decreed water rights, and it has been ascertained what priorities may be supplied, all the natural flow of the West Fork and its tributaries, between the two measuring points therein mentioned, over and above an amount determined as the proportion of the natural flow of said West Fork, with other sources of supply, to be sufficient to supply lower water users their decreed rights of appropriation up to and including the year specified, as measured at the lower point of measurement.

If this were the construction to be placed on said subparagraph 5, its effect in the instant case as shown by the testimony at the hearing would be that the Antelope Mutual Water Company would be enabled to divert an amount of water sufficient to supply all or more than its full decreed rights. The Antelope Valley Land & Cattle Company was decreed rights beginning with the year 1860 and ending with the year 1902. No water rights were decreed to that company having their inception in the years 1879, 1880, and 1881. The total of its rights subsequent to the year 1878, and beginning with the year 1882, ap-

proximates 40 second feet. The 1880 decreed rights alone on the stream system approximate 55 second feet. Testimony at the hearing was to the effect that on May 23d, this year, the petitioner was diverting 51 second feet in excess of its full decreed rights.

For a construction to be placed on said subparagraph 5 as contended for, which would have the effect of giving an appropriator on the headwaters of a stream system full rights of appropriation made years subsequent to the limit placed on appropriators down stream, the language should be so explicit as not to require resort to construction. Questions of water rights in the arid region are highly controversial, and it is rare in decrees of the character here in question that counsel in preparing a proposed decree or the court in its approval have left any material matter open to serious question. The great length of the decree here involved, sixty-seven printed pages full legal size, might possibly but not probably afford some reason for an exception to the general rule.

Subparagraph 5 makes reference to the "due proportion of the water of said river." That expression is not otherwise defined, but the contention in effect is that in a year of diminished natural flow it can mean full rights to the upper appropriator on the stream system, while the lower appropriators are of necessity compelled to accept rights limited to earlier appropriations. If there were not other provisions both of the contract in question and the decree which aid in the interpretation, such a construction even then would scarcely be justified.

Both the contract and the provisions of the decree in reference to the contract provide how the water may be taken from the river "at low stages" in case the reservoir is built as provided in the said agreement. That provision, subparagraph 2, provides that the Antelope Company "may take a quantity of water from the West Fork of Walker River at low stages in excess of its due proportion in view of the priorities herein adjudged but not exceeding the amount adjudged to it provided it turns out of the said reservoir at the same time and as a substitute therefor a like quantity of water out of its share of said waters for use by the other parties hereto. * * * "

This subparagraph 2 dealing with the rights of the parties to the action "at low stages" of the natural stream flow is strongly indicative that subparagraph 5 was intended to deal with the natural stream flow at normal or high stages when there was ample, or more than ample, water to supply all the decreed rights. It is a matter of common knowledge that, in the case of the three river systems having their source in the Sierra Nevada Mountains in the state of California and flowing into the state of Nevada, so-called flood periods occasionally occur, usually during the months of May and June, when the then natural flow is in excess of all rights of appropriation otherwise than possibly for storage purposes. It is clear that subparagraph 5 may permit a greater diversion from the natural flow of the stream during periods of high water than the total of its decreed rights, provided that at the said lower point of measurement the flow is sufficient to indicate that lower decreed rights will not be affected. Whether it was intended to mean more than this need not now be determined, in view of the fact that subparagraph 2 clearly indicates that the Antelope Company, in cases of water "at low stages," may not take water "in excess of its due proportion," excepting where it replaces the same from its supply of stored water in the reservoir.

It is clear, we think, that the expression "due proportion" as used in both subparagraphs 2 and 5 refers to relative proportions based on decreed rights by years.

As the reservoir was not constructed by a company organized in pursuance of the provisions of paragraph 6 of the stipulation and agreement, it does not appear that the Antelope Company had any rights to the stored water therein, and hence it and its successors in interest would not be able to comply with subparagraph 2 of the decree.

There are other portions of the decree which also must be taken into consideration in construing any particular provision thereof. By paragraphs 2 and 3 it is provided:

"Each of the parties above named are hereby adjudged to be the owner of the flow and use of the several amounts of water appropriated by them respectively as above set forth * * * and are entitled to take, divert and use the waters of said river * * * for the irrigation of land, the watering of stock, domestic uses, and other beneficial purposes, subject to and in accordance with the priorities above set forth.

"Each and every party to this suit * * * and their successors and assigns * * * be and each of them hereby is forever enjoined and restrained from claiming any rights in or to the waters of Walker River * * * except the rights set up and specified in this decree, and * * * enjoined and restrained from taking, diverting or in-

terfering in any way * * * with the diversion, enjoyment and use of the waters of any of the other parties to this suit as set forth in this decree, having due regard to the relative priorities therein set forth, * * * or until said parties having prior rights as herein specified have received upon their several lands the waters so adjudged to them." * * *

It is clear from the portion of the decree last quoted the rights of all parties to the suit are primarily based upon the several decreed appropriations by years.

It does not follow that, because the water commissioners determined that decreed rights subsequent to the year 1879 could not be supplied in full, any excess of the natural flow of the stream might not be apportioned among the owners of 1880 rights. The right to a diversion of water as the decree provides is not only for irrigation, but also for domestic, stock, and other beneficial purposes. It would have to be made to appear that the surplus water could not be applied to a beneficial use and was not being so applied, before an appropriator later in right could divert and use the same. Where, as appears in this case, the Walker River irrigation district acquired the site and constructed the Topaz Lake Reservoir for the storage of the winter and surplus flow of the West Walker river, in the absence of any showing that such stored water is not intended to be used to supplement the existing decreed rights when the natural flow is insufficient to supply the same in full, and that, for illustration, where the natural flow is only sufficient to supply in part 1880 rights, an additional flow is diverted from the reservoir to supplement said rights, such fact may be assumed.

It is contended on behalf of petitioner that, as priorities were not in the special master's report and in the decree apportioned to the several ditches used by the Antelope Valley Land & Cattle Company for diversion of water, that fact justifies and accounts for subparagraph 5 of paragraph 8 of the decree as the method of determining whether petitioner was diverting more water than it was entitled to, and that therefore the water commissioners were without authority to regulate the headgates of said ditches. This contention is wholly without merit, as will appear from a reference to the decree. There are but three instances in the entire decree where water rights are decreed to ditches by name, and in each instance it is the case of an incorporated ditch company. In each instance there is an accompanying statement of the lands irrigated therefrom with names of the respective owners. Diversion ditches are sometimes, though rarely, incorporated, and in some cases the company's only purpose is that of transportation for delivery of water to respective users for a charge made therefor, as in the case of Prosole v. Steamboat Canal Co., 37 Nev. 154, 140 P. 720, 144 P. 744.

At the hearing counsel for water commissioners moved to amend the petition upon which the citation for contempt was issued. As it appears that that proceeding was in the nature of a friendly one to determine the main question involved, the motion, which was objected to, is denied. Irrespective of such an amendment, in view of the conclusions reached in respect to the main question presented in both proceedings, the showing is sufficient to establish that technically the Antelope Valley Mutual Water Company should be and is adjudged in contempt. As to the directors, the proceeding is dismissed.

The petition of the Antelope Valley Mutual Water Company is denied.

The Antelope Valley Mutual Water Company is assessed the costs of both proceedings, including reporter's fees and transcript of the testimony.